1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MICHAEL HAWKINS

11          Plaintiff,                    No. CIV S-08-2791 CMK (TEMP) P

12      vs.

13   SCOTT RUSSELL, et al.

14          Defendants.              ORDER

15   _____/

16          Plaintiff is a state prisoner proceeding pro se and in forma pauperis with an action

17   under 42 U.S.C. § 1983.  He alleges that defendant Russell's confiscation of a photocopy of

18   *Blood in My Eye*, a book by George L. Jackson, violated his rights under the First Amendment

19   and the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  He has also

20   sued defendants Packard, Hamilton and Pimental, each of whom reviewed his inmate appeals at

21   different stages of the administrative grievance process.  Defendants have moved for summary

22   judgment.  The parties have consented to the magistrate judge's jurisdiction.  28 U.S.C. § 636(c).

23      I.      Findings of Fact

24          Much of the factual background of this case is not disputed.  However, there is

25   considerable dispute over whether *Blood in My Eye* was prohibited material at the time defendant

26   confiscated it.

1    A.   Undisputed facts

2         On August 14, 2007, defendant Russell, a correctional officer at Folsom State

3    Prison ("Folsom"), conducted a search of plaintiff's cell.  Defendants' Statement of Undisputed

4    Facts 1 (DUF) (Docket No. 21-1).  Russell found and confiscated a photocopy of *Blood in My*

5    *Eye*, a published collection of correspondence by George L. Jackson.  Id.  Jackson was a

6    California state prisoner and founding member of a prison gang known as the Black Guerilla

7    Family (BGF).  DUF 3.  Jackson was involved in the murders of prison guards at the California

8    Training Facility in Soledad and at San Quentin State Prison.  DUF 2.  He was fatally shot during

9    an attempt to escape from San Quentin in 1971.  DUF 4.  According to defendants, "Jackson is

10   considered a martyr by the BGF and... is referenced in multiple BGF materials such as the

11   Gang's oath and constitution."  DUF 5.  Plaintiff does not dispute that characterization of

12   Jackson's legacy in the present-day BGF.  See Plaintiff's Response to DUF 5 (Docket No. 24).

13        Russell completed a cell search report, wherein he recorded his confiscation of the

14   book as "contraband."  Plaintiff's Opposition, Ex. A at 5 (Docket No. 25).[1]  The next day, he

15   filed a memorandum in plaintiff's C-file, documenting his confiscation of the book and stating

16   that "[t]his document should count as one validation source point (written materials) to Hawkins'

17   membership and/or association with the prison gang known as BGF."  Motion for Summary

18   Judgment, Ex. A (Docket No. 21-3).  An inmate must have at least three gang validation "points"

19   before he can be validated by the California Department of Corrections and Rehabilitation

20   (CDCR) as a gang member or gang associate.  Cal. Admin. Code tit. 15 § 3378(c)(3), (4).[2]  In

21   May 2009, plaintiff was validated as a member of BGF based on five validation points, one of

22   which was his possession of *Blood in My Eye*.  Opposition, Ex. R.

23

24        [1] The court uses the pagination assigned by the court's electronic filing system.

25        [2] The court hereafter uses the abbreviation "CCR" to refer to those sections of the
26   California Code of Regulations implicated in this case.  All of them appear in Title 15 of the
     Code.

1    Plaintiff submits that he was never informed before August 14, 2007, that *Blood*

2 *in My Eye* was contraband and that possessing it could have negative consequences under prison

3 regulations.  Plaintiff's Separate Statement of Disputed Facts (PDF) 1 (Docket No. 26).  In his

4 complaint, plaintiff states that he first received the photocopy of *Blood in My Eye* from his

5 mother through the mail in 2003, when he was incarcerated at Lancaster State Prison.

6 Complaint, ¶ 13.  He points out that all incoming mail to inmates is opened and inspected for

7 contraband before being delivered.  Id. at ¶ 18.  He also states that as a result of regular cell

8 searches, Lancaster prison staff were aware of his possession of the book and never confiscated it

9 or informed him that it was contraband and could be used to validate him as a gang member.  Id.

10 at ¶ 21.  He was later transferred to Donovan State Prison, where his possessions were searched

11 again.  Id. at ¶ 26.  Donovan officials again released the book to him after the search.  Id. at ¶ 27.

12    Plaintiff states that when he arrived at Folsom in December 2006, officials

13 searched his personal property, which included *Blood in My Eye*, and returned his copy of the

14 book to him.  Id. at ¶ 33.  He also states that thereafter his cell at Folsom was "routinely searched

15 by [correctional officers], who as a result of searching plaintiff's cell were aware that plaintiff

16 was in possession of the book 'Blood in My Eye,' and never informed plaintiff that the book was

17 disallowed and contraband and... would be used towards validating him as a member or associate

18 of the BGF."  Id. at ¶ 36.  Plaintiff alleges that defendant Russell was not assigned to his tier but

19 "has a history of searching cells not assigned to his tier (especially the cells of African-American

20 inmates)."  Id. at ¶ 39.

21    Defendants do not dispute plaintiff's account that he possessed the book for years

22 without warning or penalty by officials at other prisons.  Moreover, and more pertinently to this

23 case, they do not dispute that prison officials at Folsom knew he had the book as soon as he

24 arrived in December 2006 and throughout the months before defendant Russell confiscated it on

25 August 14, 2007.

26 /////

B.   Classification of *Blood in My Eye* at the time of confiscation

In his sworn declaration submitted in support of summary judgment, defendant Russell states:

> At the time I confiscated Mr. Hawkins's copy of... *Blood in My Eye*, it was my understanding, based on my discussions with the prison's Institutional Gang Investigators, that inmates were prohibited from possessing the book because it had been determined to be training material for the [BGF]. Therefore, my confiscation of Hawkins's book was an attempt to eliminate threats to the prison and staff and its inmates and to maintain prison safety.
>
> It is and was my understanding, based on my discussions with the prison's Institutional Gang Investigators, that in October 2007, the prison could restrict materials such as *Blood in My Eye* from the inmates, even though the California Department of Corrections and Rehabilitation has [sic] not previously and specifically identified a specific item to be restricted from its inmates.

Declaration of S. Russell, ¶¶ 2-3 (Docket No. 21-9).  Russell's affidavit contains somewhat contradictory statements.  He says that "[a]t the time" he confiscated the book, it was his "understanding" that inmates were prohibited from possessing it because it was considered gang training material.  However, he dates his "understanding" that the prison could restrict materials like *Blood in My Eye* at October 2007 – two months after Russell confiscated the book from plaintiff.

Defendant Packard was an institutional gang investigator (IGI) at the time Russell confiscated plaintiff's book.  In his sworn declaration, he states that "investigations have determined that the writings of George L. Jackson are mandatory reading for BGF members and associates and are considered to be training materials for the BGF."  Declaration of J. Packard, ¶ 4 (Docket No. 21-8).  He also states, under penalty of perjury, that "[o]n August 14, 2007, Folsom State Prison had in force an institutional ban on *Blood in My Eye*, even though it was not a book that was under the [CDCR's] statewide ban list."  Id. at ¶ 6.  At the first formal level of administrative appellate review, defendant Packard investigated plaintiff's claim and wrote in his decision to deny plaintiff's appeal that "[t]he book was confiscated due to the contents of prison

4

1   gang material.  According to the Office of Correctional Safety [OCS,] the book 'Blood in My

2   Eye' [h]as been identified as a training manual for active BGF members."  Opposition, Ex. C at

3   19.  That decision is dated October 1, 2007.  Id. at 16.

4           In their statement of undisputed facts, defendants repeat Packard's assertion of an

5   "institutional ban" on *Blood in My Eye* in August 2007 (DUF 16), but plaintiff has presented

6   evidence to show that sworn statement to be completely false.  On August 8, 2008, plaintiff

7   submitted a request to the Folsom prison mailroom: "I have been informed that the book 'Blood

8   in My Eye' is not allowed in the institution.  If so could you please send me a copy of the memo

9   or a CDC 1819 stating as such."  Opposition, Ex. H.  Two days later, the mailroom responded:

10  "The mailroom has not disallowed the above stated book."  Id.  On February 24, 2009, plaintiff

11  wrote OCS, the government office Packard cited in his appellate decision, with a request for

12  public records, seeking "[a]ll documents or writings in possession of the Office of Correctional

13  Safety which has been distributed to Folsom State Prison stating that the book[] 'Blood in My

14  Eye' ... [is a] training manual for Black Guerilla Family members[.]" Opposition, Ex. D.  On

15  March 11, 2009, OCS responded that "No documents were found by the OCS which is

16  responsive to your request."  Id.  Finally, and most damningly for Packard's sworn statement that

17  an "institutional ban" on *Blood in My Eye* existed at the time Hawkins' copy was confiscated,

18  plaintiff submits a memorandum by the warden of Folsom State Prison to all staff, in which he

19  declares, "[a]n adminsitrative ban of the book 'Blood in My Eye'... authored by George Jackson,

20  is now in effect."  Opposition, Ex. M at 57.  The memo is dated January 8, 2009, more than

21  sixteen months after plaintiff's copy of the book was confiscated.

22          The court finds there is no genuine dispute that Folsom had not imposed a formal

23  ban on *Blood in My Eye* on August 14, 2007, when defendant Russell confiscated the book from

24  plaintiff.  However, that does not necessarily mean that the book was not taken pursuant to

25  California's prison regulations.  As discussed below, the application of the relevant regulation to

26  this case is crucial to deciding plaintiff's First Amendment claim.

1    II.    Standard of Review for Summary Judgment

2          Summary judgment is appropriate when the movant demonstrates that there exists

3    "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

4    matter of law." Fed. R. Civ. P. 56(c).

5               Under summary judgment practice, the moving party
                always bears the initial responsibility of informing the district court
6               of the basis for its motion, and identifying those portions of "the
                pleadings, depositions, answers to interrogatories, and admissions
7               on file, together with the affidavits, if any," which it believes
                demonstrate the absence of a genuine issue of material fact.
8
9    Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

10   nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

     judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers
11
     to interrogatories, and admissions on file.'" Id.  Indeed, summary judgment should be entered,
12
13   after adequate time for discovery and upon motion, against a party who fails to make a showing

14   sufficient to establish the existence of an element essential to that party's case, and on which that

15   party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

16   concerning an essential element of the nonmoving party's case necessarily renders all other facts

     immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as
17
     whatever is before the district court demonstrates that the standard for entry of summary
18
19   judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

20          If the moving party meets its initial responsibility, the burden then shifts to the

21   opposing party to establish that a genuine issue as to any material fact actually does exist.  See

22   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

23   establish the existence of this factual dispute, the opposing party may not rely upon the

24   allegations or denials of its pleadings but is required to tender evidence of specific facts in the

25   form of affidavits, and/or admissible discovery material, in support of its contention that the

26   dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

1   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

2   of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

3   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

4   1987).  The opposing party must also demonstrate that the dispute is genuine, i.e., that the

5   evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool

6   v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

7          To establish the existence of a factual dispute, the opposing party need not

8   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

9   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

10  trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

11  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

12  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

13  amendments).

14         In resolving the summary judgment motion, the court examines the pleadings,

15  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

16  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

17  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

18  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

19  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

20  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

21  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

22  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

23  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

24  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

25  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

26  /////

1    III.    <u>Analysis</u>

2            Plaintiff claims that Russell's confiscation of *Blood in My Eye* violated his right

3    under the First Amendment to freedom of speech.  He claims that after it was confiscated, he

4    "informed defendant Russell that his purpose for possessing and reading the book was for its

5    political and Black historical contents."  Complaint, ¶ 43.

6            "[W]hen a prison regulation impinges on inmates' constitutional rights, the

7    regulation is valid if it is reasonably related to legitimate penological interests."  <u>Turner v. Safely</u>,

8    482 U.S. 78, 89 (1987).  <u>Turner</u> requires a court to consider four factors in determining the

9    constitutional validity of a prison regulation: (1) whether the regulation has a logical connection

10   to the legitimate government interests invoked to justify it; (2) whether there are alternative

11   means of exercising the rights that remain open to the inmate; (3) whether accommodation of the

12   asserted constitutional right will have an impact on other inmates, guards, and prison resources;

13   (4) whether there are ready alternatives that fully accommodate the prisoner's rights at de

14   minimis cost to valid penological interests.  <u>Id.</u> at 89-90.

15           "The first <u>Turner</u> factor is multifold: we must determine whether the

16   governmental objective underlying the regulations at issue is legitimate and neutral, and that the

17   regulations are rationally related to that objective."  <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 414

18   (1989).  Applying this prong first requires identifying what regulation authorized defendant

19   Russell to confiscate the book.

20           Writing in support of summary judgment, defendants submit §§ 3006(c)(1), (3),

21   (5) and (6) as the specific provisions under which *Blood in My Eye* qualified as contraband

22   subject to confiscation.  <u>See</u> Defendants' Memorandum, p. 9.[3]  Those subsections appear in a

23   regulation entitled "Contraband."  The subsections state:

24   _____

25           [3] Defendants refer to these regulations in response to plaintiffs' claim that his right to due
     process was violated.  However, given that it is the only point in their briefing at which
26   defendants are actually specific about what regulation authorized the confiscation, it applies with
     equal force to plaintiff's claim that they violated his right to free speech.

1
2
(c) except as authorized by the institution head, inmates shall not possess or have under their control any matter which contains or concerns any of the following:

3
4
   (1)   Any matter of a character tending to incite murder; arson; riot; or any form of violence or physical harm to any person, or any ethnic, gender, racial, religious, or other group. ...

5
   (3)   Contraband, or sending or receiving contraband. ...

6
   (5)   Plans to disrupt the order, or breach the security, of any facility.

7
8
   (6)   Plans for activities which violate the law, these regulations, or local procedures.

9
Defendants also cite CCR § 3006(d) in their statement of undisputed facts as authority for the

10
confiscation.  DUF 19.  That regulation states, "[a]nything in the possession of an inmate which

11
is *not contraband* but will, if retained in possession of the inmate, present a serious threat to

12
facility security or the safety of inmates and staff, shall be controlled by staff to the degree

13
necessary to eliminate the threat."  (Emphasis added).

14
       The latter regulation, § 3006(d), applies most directly to this case because there

15
was no formal ban on the book at the time it was confiscated such that it could be called,

16
properly, "contraband."  § 3006(d) is also more consonant with defendant Russell's stated reason

17
for confiscating the book: "my confiscation of Hawkins's book was an attempt to eliminate

18
threats to the prison and staff and its inmates and to maintain prison safety and security."  Russell

19
Decl., ¶ 2.

20
       "The legitimacy of the Government's purpose in promulgating [this] regulation[]

21
is beyond question.  The regulation[] [is] aimed at protecting prison security, a purpose this Court

22
has said is 'central to all other correctional goals.'"  Thornburgh, 490 U.S. at 415 (quoting Pell v.

23
Procunier, 417 U.S. 817, 823 (1974)).  CCR § 3006(d) clearly qualifies as a regulation enacted

24
for the legitimate goal of protecting prison inmates and staff.   Moreover, the facial neutrality of

25
the regulation is readily apparent.

26
/////

1    "However, the First Amendment inquiry does not end with this facial analysis."

2    Hagis v. Foster, 312 F.3d 404, 410 (9th Cir. 2002).  Indeed, plaintiff has not argued that any

3    prison regulation invoked in this case is, on its face, constitutionally invalid.  Instead, the

4    gravamen of his case is that, *as applied to him*, the defendants' exercise of the authority

5    conferred by § 3006(d) to confiscate his book as "a serious threat to facility security or the safety

6    of inmates and staff" was unconstitutional.  "In ruling on this as-applied challenge, we examine

7    whether applying the regulation to that speech... was rationally related to the legitimate

8    penological interest asserted by the prison."  Id.  In other words, "[i]n conducting the as-applied

9    analysis, we must determine whether there is a genuine dispute as to whether [*Blood in my Eye*]

10   in fact implicated legitimate security concerns."  Id.; see also Thornburgh, 490 U.S. at 419

11   (remanding the case to the lower court "for an examination of the validity of the regulations as

12   applied to any of the 46 publications introduced at trial as to which there remains a live

13   controversy").

14   For whatever reason, the defendants have not supplied the court with any part of

15   *Blood in My Eye* such that the court could determine whether the book was reasonably construed

16   as a security threat.  This omission is fatal to their motion for summary judgment.

17   Two cases from the Northern District of California illustrate the deficiency the

18   court faces in not having any of the contents of *Blood in My Eye* before it.  In Avery v.

19   Thompson, 2010 WL 3932076 (N.D.Cal.), the prison confiscated 265 pamphlets, all published

20   by a company that sold white supremacist material.  The prison's asserted justification was that

21   the pamphlets were not, as the inmate contended, religious in nature but "propagated 'neo-Nazi'

22   and white supremacy beliefs instead."  Id. at *1.  The court cited long-established Supreme Court

23   precedent that prison officials are allowed broad discretion in limiting the possession of

24   publications because of the concern that circulation of the material could sow discord and

25   violence inside the prison.  However, the court's analysis of the First Amendment claims ended

26   with this:

1
2
3
4

> [N]either party submitted any evidence regarding the specific
> content of any of the pamphlets, much less all 265 of them.
> Without such evidence, there are genuine issues of material fact as
> to whether any of the 165 pamphlets advocated violence or were
> reasonably likely to cause violence at the prison and whether the
> decision to confiscate those pamphlets was rationally related to a
> legitimate government interest.

5   Id. at *4.

6          In Harrison v. Institutional Gang of Investigations, 2010 WL 653137 (N.D.Cal.),

7   the court addressed the plaintiff's claim that the confiscation of some of his incoming and

8   outgoing mail violated his right to freedom of speech.  The defendants argued that the

9   confiscation was permissible because the inmate's mail referenced events and organizations

10  affiliated with the BGF.  One of the defendants, an IGI at Pelican Bay State Prison, submitted a

11  sworn declaration summarizing the serious threat posed by the BGF, including its observation of

12  the event "Black August:" "'During Black August, members of the BGF advocate retaliation

13  against correctional officers and others for the death of BGF 'comrades' who have allegedly been

14  murdered by prison officials.'"  Id. at *1.  Some of the Harrison plaintiff's mail contained

15  references to Black August, black revolutionary figures and outside organizations that, according

16  to the prison, "demonstrated Harrison's active affiliation with the BGF prison gang."  Id. at *4.

17         The Harrison court noted that "[p]rison officials are not required to show with

18  certainty that any particular correspondence would have adverse consequences[,] because they

19  are given some latitude in anticipating the probable consequences of allowing a certain speech in

20  and out of a prison environment."  Id. at *5 (citing Procunier v. Martinez, 416 U.S. 369, 414

21  (1974)).  However, as the Harrison court observed, "[a] review of published circuit cases both

22  upholding and rejecting censorship indicates that the courts closely examine the fit between

23  asserted penological interests and the particular [material] being censored, rather than accept at

24  face-value an assertion by prison officials that the confiscation serves security or rehabilitation

25  interests."  Id. at *6, n.3 (collecting cases).

26  /////

1          Here too the defendants are owed deference in their judgments about the BGF,

2   material in the possession of inmates and prison security.  But here too they submit the

3   connection between prison security and confiscating *Blood in My Eye* as a self-validating fact

4   that the court would have to accept at face-value in order to grant their motion for summary

5   judgment.  This court cannot do in light of the undisputed facts on record, which include

6   defendant Packard's misrepresentations about an "institutional ban" on *Blood in My Eye* that had

7   yet to be imposed when the book was confiscated and the uncontroverted history of plaintiff's

8   open possession of the book for several years in prison, including almost two years at Folsom.

9   Moreover, the law controlling the issue makes it clear that the court simply cannot accept the

10  defendants' *ipse dixit* that the content of the book justified confiscation because, as defendant

11  Packard wrote in his decision, it included "prison gang material."  "[T]he First Amendment

12  requires a more nuanced approach."  Harrison at *6.

13         Where, as here, written material is confiscated "on the basis of its content... we

14  must scrutinize the prison's asserted justification more closely."  Stefanow v. McFadden, 103

15  F.3d 1466, 1472 (9th Cir.1996).[4]  Without more than the individual defendants' say-so, the court

16  has nowhere to look to make the summary judgment determination of whether a genuine dispute

17  of material fact exists regarding their asserted justification that *Blood in My Eye* had to be

18  confiscated because it posed a threat to prison security.  The court is therefore in the same

19  position the court faced in Harrison and Avery.  In Harrison, the court denied the motion for

20  summary judgment and set the case on a track for trial.  In Avery, the court allowed the moving

21  party to bring a renewed motion for summary judgment "if he can make the proper evidentiary

22  showing."  Avery at *5.  Under the present circumstances, the court finds the latter to be the

23

24         [4] The Ninth Circuit in Stefanow had the benefit of reviewing the specific white
    supremacist tract confiscated from a member of the Aryan group Church of Jesus Christ
    Christian ("CJCC").  After citing relevant passages and hearing testimony from prison officials,
25  the court found that "prison officials reasonably concluded that this material is so inflammatory it
    is reasonably likely to incite violence in the prison."  Id. at 1469-70, 1473.  It is impossible for a
26  court to so hold without examining the actual contents of the publication.

1  better course.  Plaintiff may also file a motion for summary judgment within the time allowed by

2  the court in this order, if he so chooses.[5]

3            Accordingly, IT IS HEREBY ORDERED that:

4            1.   The motion for summary judgment (Docket No. 21) is denied without

5  prejudice.

6            2.   The parties have thirty days from the entry of this order in which to file

7  renewed motions for summary judgment.

8            3.   Any opposition or statement of non-opposition to a motion for summary

9  judgment shall be filed within fourteen days of service.

10            4.   The motion to vacate the trial schedule (Docket No. 35) is denied as moot.

11

12

DATED:  March 30, 2011

13
                                    _____
14                                    **CRAIG M. KELLISON**
                                    UNITED STATES MAGISTRATE JUDGE
15

16

17

18  hm
    hawk2791.msj
19

20

21

22

23
    _____
24        [5] The parties are advised that any summary judgment arguments presented pursuant to
    this order should be presented in full.  The parties should not merely rely on or incorporate
25  arguments presented in support of or opposition to the instant motion.  The parties may, however,
    refer to exhibits already filed in the presentation of the instant motion for summary judgment or
26  its opposition, if they so choose.