IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHAEL HAWKINS,

        Plaintiff,                No. CIV S-08-2791 CKD P

    vs.

SCOTT RUSSELL, et al.,

        Defendants.        ORDER

_____/

I. <u>Introduction</u>

        Plaintiff, a state prisoner proceeding pro se, has filed this civil rights action seeking relief under 42 U.S.C. § 1983.  This case proceeds on the complaint originally filed in superior court and removed to this court on November 20, 2008.  Plaintiff alleges that defendant Russell's confiscation of a photocopy of *Blood in My Eye*, a book by George L. Jackson, violated his rights under the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  He has also sued defendants Packard, Hamilton, and Pimental, each of whom reviewed his inmate appeals at different stages of the administrative grievance process.  Defendants' first motion for summary judgment was denied without prejudice on March 31, 2011.  Pending is defendants' renewed motion for summary judgment, filed on July 1, 2011.  Plaintiff has filed an opposition and defendants have filed a reply.  The parties have consented to

1  the magistrate judge's jurisdiction.  28 U.S.C. § 636(d).  For the following reasons, the court will

2  grant defendants' motion for summary judgment.

3  I.  Factual and Procedural Background

4  A.  Events at Issue

5              As noted in the order of March 31, 2011, much of the factual background of this

6  case is not disputed.

7              In his complaint, plaintiff states that he first received a photocopy of *Blood in My*

8  *Eye* from his mother through the mail in 2003, when he was incarcerated at Lancaster State

9  Prison.  Complaint ¶13.  He points out that all incoming mail to inmates is opened and inspected

10  for contraband before being delivered.  Id. at ¶ 18.  He also states that a result of regular cell

11  searches, Lancaster prison staff were aware of his possession of the book and never confiscated it

12  or informed him that it was contraband and could be used to validate him as a gang member.  Id.

13  at ¶ 21.  He was later transferred to Donovan State Prison, where his possessions were searched

14  again.  Id. at ¶ 26.  Donovan officials again released the book to him after the search.  Id. at ¶ 27.

15              Plaintiff states that when he arrived at Folsom State Prison in December 2006,

16  officials searched his personal property, which included *Blood in My Eye*, and returned his copy

17  of the book to him.  Id. at ¶ 33.  Plaintiff also states that thereafter his cell at Folsom was

18  "routinely searched by [correctional officers], who as a result of searching plaintiff's cell were

19  aware that" plaintiff possessed the book and never informed him that it was contraband or would

20  be used toward validating him as a gang member.  Id. at ¶ 36.  Defendants counter that plaintiff's

21  photocopy of the book was stored in a box with other papers, and thus despite cell searches by

22  staff, plaintiff "could have possessed the book for many years without any prison official

23  discovering his copy."  Defendants' Statement of Undisputed Facts 23 (DUF) (Dkt. No. 42-2.)

24              On August 14, 2007, defendant Russell, a correctional officer at Folsom,

25  conducted a search of plaintiff's cell.  In a sworn declaration attached to defendants' reply, he

26  states that "[t]he first item I found during that search that indicated that Hawkins might be

associated with the [gang Black Guerilla Family] was a book with the Swahili word 'Nyawi' written on the side, [and] the Swahili phrases 'Nyawi Tafuta' [and] 'Muata Modibo' written next to Hawkins' name and prison number.  Some inmates affiliated with the BGF, as well as inmates from affiliated disruptive groups, have been known to take Swahili names as their gang monikers."  Dkt. No. 53, Ex. A at ¶ 5; <u>see also</u> Dkt. No. 53, Attachment 1.  Russell confiscated the following four items from plaintiff's cell:

- A document entitled "So That We Don't Fool Ourselves – Again: Study Notes on Secure Communication" published by Spear and Shield Publications. Defendants contend, and plaintiff does not dispute, that the Introduction of this document quotes from George Jackson's book *Soledad Brother*, and that the document discusses how to build "vehicles, lines and methods of (secure) communication" in furtherance of a revolutionary movement to overthrow the government, called the "New Afrikan Movement."

- An article entitled "History Is a Weapon!  Black August Resistance" by Watani Tychimba.  Defendants contend, and plaintiff does not dispute, that this article advocates that members of the "Afrikan People's Organization" participate in a fast during the month of August in honor of three individuals: (1) Jonathan Jackson (younger brother of George Jackson), who was killed in an attempt to free three San Quentin inmates from a Marin County courtroom in August 1970; (2) George Jackson, who was killed while attempting to escape from San Quentin in August 1971; and (3) Khatari Gaulden, who died in prison in August 1978.

- An issue of *Prison Focus* newspaper, which contained a picture of George Jackson.

- A photocopy of *Blood In My Eye* by George Jackson.

1   DUF at 13-17; <u>see</u> <u>also</u> Plaintiff's Response to DUF 13-17 (Dkt. No. 48-1).[1]

2         The Spear and Shields publication and the Tychimba article were jointly used as

3   one source point toward plaintiff's validation as an associate of the gang Black Guerilla Family

4   (BGF).  The photograph of Jackson and the copy of *Blood in My Eye* were each used as a gang

5   validation point, for a total of three points resulting from the August 2007 search.[2]  <u>Id.</u>

6         In his complaint, plaintiff states that defendant Russell did not give him written

7   notice that *Blood in My Eye* was contraband, and that he was not so informed until three days

8   after it was confiscated.  Complaint ¶ 41.  Plaintiff told Russell "that his purpose for possessing

9   and reading the book was for its political and Black historical contents.  Plaintiff further

10  informed defendant Russell that he felt that he was confiscating the book based upon his own

11  personal dislike for" author George Jackson.  <u>Id.</u> at ¶¶ 43-44.

12        On August 25, 2007, plaintiff filed an inmate grievance claiming that Russell

13  violated his constitutional rights by confiscating *Blood in My Eye* based on Russell's own

14  determination that it was contraband, "without any known departmental or institutional policy or

15  memo[.]"  This grievance was denied.  Dkt. No. 21-4 at 2-3.

16        Plaintiff filed a first-level appeal of the denial of his grievance.  On October 1,

17  2007, following an interview with plaintiff, defendant Packard denied the appeal, stating in part:

18  \\\\\

19  _____

20     [1]  Per the March 31, 2011 order allowing a renewed motion for summary judgment,
    defendants were not required to resubmit documents attached to their first motion for summary
21  judgment.  One such document is a report signed by Russell and dated August 15, 2007.  In it, he
    states that during an August 14, 2007 search of plaintiff's cell, he "discovered written material
22  relating to the prison gang the Black Guerilla Family (BGF)" consisting of the above four items.
    The report includes a paragraph about Jackson and the BGF, noting that Jackson's "writings are
23  considered mandatory reading for all BGF members and associates. . . . This document should
    count as one validation source point, (written materials) to Hawkins' membership and/or
24  association with the prison gang known as the BGF."  (Dkt. No. 21-3 at 2.)

25     [2]  Defendants go on to describe additional, allegedly gang-related items confiscated from
    plaintiff in July and August 2008.  DUF 18-20.  However, these later events have no bearing on
26  whether the confiscation of *Blood in My Eye* in August 2007 was a violation of plaintiff's
    constitutional rights.

1    The book 'Blood in My Eye' will not be returned to you.  This
     book was produced from letters authored by one of the BGF
2    founding members and former BGF leader George Lester Jackson.
     . . . The book was confiscated due to the contents of prison gang
3    material. . . . [It has] been identified as a training manual for active
     BGF members.  This information has been received through active
4    BGF members debriefing (dropping out of the gang).  Your
     possession of this book has been documented for placement in your
5    central file as a point of validation towards your association with
     BGF.

6

7    Dkt. No. 21-5 at 2-5.  In support of his decision, Packard cited California Code of Regulations

8    (CCR) Title 15, Section 3378, which concerns verification of an inmate as a gang member or

9    associate.[3]

10          Plaintiff filed a second-level appeal, which was denied by defendant Hamilton on

11   December 11, 2007.  Hamilton wrote:

12    The book 'Blood in My Eye' was produced from letters authored
      by George L. Jackson, one of the Black Guerilla Family (BGF)
13    founding members.  Per the [CDCR] Department Operations
      Manual (DOM), Section 52070, the BGF is an authorized prison
14    gang.  As such, your possession of the book has been documented
      and placed in your central file as a point of validation towards your
15    association with the BGF and copies of this documentation have
      been routed to the department's gang investigators at the Office of
16    Correctional Safety (OCS).  Thus, this book will not be returned to
      you.  This book will be retained in FSP-ISU pending the outcome
17    of any further investigation into your prison gang activities as
      deemed necessary by institutional or departmental staff.

18

19    _____

       [3] Under section 3378(c)(8), "independent source item[s]" that support a determination
20   that an inmate is involved with a gang include:

21    (C) Written material.  Any material or documents evidencing gang
      affiliation such as the membership or enemy lists, constitutions,
22    organizational structures, codes, training material, etc. of specific
      gangs. . . .
23
      (D) Photographs.  Individual or group photographs with gang
24    connotations such as those which include insignia, symbols, or
      validated gang affiliates. . . .
25

26   See Ellis v. Cambra, No. 1:02-cv-5646 AWI SMS PC, 2010 WL 4137158 at *4 (E.D. Cal. Oct.
     19, 2010) (describing inmate gang verification process per CCR § 3378 and related regulations).

(Dkt. No. 21-6 at 5.)  In support of his decision, Hamilton cited 15 CCR § 3378 (cited above) and §3006, governing contraband.[4]

Plaintiff filed a Director's Level appeal.  Defendant Pimental, an Appeals Examiner, issued a decision denying the appeal on behalf of the Director of CDCR on April 4, 2008.  Pimental wrote:

> It is the appellant's position that the FOL staff inappropriately confiscated his personal property and alleged that the property is gang related.  The appellant contends that the property is political, cultural, revolutionary and educational and is not gang related. . . . The appellant requests that an investigation be conducted, that his property be returned to him, or that he be compensated.
>
> . . .
>
> The institution acted correctly and under the proper authority when confiscating the appellant's gang related property for investigative purposes.  The issue in this case is not whether the appellant had through legitimate means acquired the property, but that the property was evidence of gang activity thus subjecting it to seizure as contraband.  The Director's Level of Review (DLR) notes that the FOL provided an in-depth analysis of the book and its significance to the BGF.  The DLR notes that the appellant attempts to justify his possession of gang material by asserting that it is related to a political movement.  The DLR finds this argument

---

[4]  That regulation provides in part:

> (c) Except as authorized by the institution head, inmates shall not possess or have under their control any matter which concerns or contains any of the following:
>
> (1) Any matter of a character tending to incite murder; arson; riot; or any form of violence or physical harm to any person, or any ethnic, gender, racial, religious, or other group. ...
>
> (3) Contraband, or sending or receiving contraband[.]

Section 3006 also contains a catch-all provision stating:

> (d) Anything in the possession of an inmate which is not contraband but will, if retained in possession of the inmate, present a serious threat to facility security or the safety of inmates and staff, shall be controlled by staff to the degree necessary to eliminate the threat.

1
2
3
> lacks merit as the BGF has been deemed a prison gang that promotes violence.  Based upon the above factors, the appellant has failed to offer any new or compelling evidence that substantiates his claim; therefore, relief at the DLR has not been established.

4   (Dkt. No. 21-7 at 2.)  Pimental cited several regulations in support of his decision, including 15

5   CCR § 3006, governing contraband.  (Id.)

6          In the complaint, plaintiff claims that defendants violated his First Amendment

7   rights "when they knowingly enforced an illegal underground rule, censoring the book 'Blood in

8   My Eye' solely based upon the fact that it was authored by George L. Jackson and not based

9   upon its contents.  Thus preventing plaintiff or any African-American inmate at Folsom State

10  Prison from reading or possessing said book."  (Cmplt. ¶ 73.)  Plaintiff also claims that

11  defendants violated his rights to equal protection and due process by failing to give plaintiff

12  notice that *Blood in My Eye* would be censored, or of "the consequences for any African-

13  American inmate found in possession of said book.  As a result, plaintiff is being subjected to the

14  process of being validated as a member or an associate of the BGF."  (Id. ¶¶ 75, 76.)

15  B. Defendants' First Motion for Summary Judgment

16         In their original motion for summary judgment filed on April 2, 2010, defendants

17  argued that, "[a]t the time of Hawkins' cell search Folsom State Prison had in effect, an

18  institutional ban on George L. Jackson Literature[,]" and that defendant Russell was "acting

19  under the belief that the institutional ban of *Blood in My Eye*" was constitutional.  (Dkt. No. 21-1

20  at 5-6.)  In his sworn declaration in support of the motion, Russell did not mention the other three

21  items he confiscated from plaintiff's cell, but stated:

22
23
24
25
> At the time I confiscated Mr. Hawkins's copy of the George L. Jackson book, Blood in my Eye, it was my understanding, based on my discussions with the prison's Institutional Gang Investigators, that inmates were prohibited from possessing the book because it had been determined to be training material for the prison gang Black Guerilla Family (BGF).

26  (Dkt. No. 21-9 at 1.)  Similarly, defendant Packard, who was an Institutional Gang Investigator at

1    Folsom in August 2007, declared in support of defendants' original motion: "On August 14,

2    2007, Folsom State Prison had in force, an institutional ban on *Blood in my Eye*. . . [.]  Any

3    inmate in possession of *Blood in my Eye*, will have it confiscated."  (Dkt. No. 21-8 at 2.)

4              However, based on evidence presented by plaintiff, the court in its March 31,

5    2011 order determined that defendants' assertion of an "institutional ban" on *Blood In My Eye* in

6    August 2007 was "completely false."  Rather,

7              there is no genuine dispute that Folsom had <u>not</u> imposed a formal
             ban on *Blood in My Eye* on August 14, 2007, when defendant
8              Russell confiscated the book from plaintiff.  However, that does
             not necessarily mean that the book was not taken pursuant to
9              California's prison regulations.  As discussed below, the
             application of the relevant regulation to this case is crucial to
10             deciding plaintiff's First Amendment claim.

11   (Dkt. No. 37 at 3; emphasis added.)  The court determined that 15 CCR § 3006(d), the catch-all

12   provision of the contraband regulation,

13             applies most directly to this case because there was no formal ban
             on the book at the time it was confiscated such that it could be
14             called, properly, 'contraband.'  § 3006(d) is also more consonant
             with defendant Russell's stated reason for confiscating the book:
15             'my confiscation of Hawkins's book was an attempt to eliminate
             threats to the prison and staff and its inmates and to maintain
16             prison safety and security.'  Russell Decl., ¶ 2.

17   (Dkt. No. 37 at 9.)

18             The court further determined that

19             the gravamen of [plaintiff's] case is that, *as applied to him*, the
             defendants' exercise of the authority conferred by § 3006(d) to
20             confiscate his book as a 'serious threat to facility security or the
             safety of inmates and staff' was unconstitutional.  'In ruling on this
21             as-applied challenge, . . . we must determine whether there is a
             genuine dispute as to whether [Blood in My Eye] in fact implicated
22             legitimate security concerns.'

23   (<u>Id</u>. at 10; internal citations omitted.)

24             Because defendants had not submitted any part of *Blood in My Eye* "such that the

25   court could determine whether the book was reasonably construed as a security threat[,]" the

26   court denied defendants' motion without prejudice, allowing them to make a renewed motion for

1  summary judgment with the "proper evidentiary showing." (Id. at 10, 12; internal citations

2  omitted.)

3  C.  Defendants' Second Motion for Summary Judgment

4          On July 1, 2011, defendants filed their renewed motion for summary judgment.

5  Instead of submitting a portion of *Blood in My Eye* for the court's review, they introduced a new

6  theory as to why Russell confiscated the book.  Per the court's earlier order, it was not the subject

7  of a formal ban at Folsom Prison in August 2007; nor was it confiscated "because the contents of

8  the book, or the ideas expressed in the book constituted a threat to Folsom Prison."  (Dkt. No.

9  42-2 ("Mot.") at 8.)  Indeed, "the content of Jackson's books does not directly threaten the safety

10  of California's prisons and there are many legitimate reasons why an inmate might desire to read

11  Jackson's books[.]"  (Id. at 14-15.)  Defendants further assert that "[i]f the book 'Blood in My

12  Eye' was the only 'evidence' of Hawkins' association with the BGF, it would not have been

13  confiscated.'"  (Id. at 17; see DUF 25-27, all disputed by plaintiff.)

14          The lynchpin of defendants' current argument in favor of summary judgment is

15  that, during his search of plaintiff's cell in August 2007, defendant Russell found not only a

16  photocopy of *Blood in My Eye*, but three other BGF-related items: the Spear and Shield

17  publication about "secure communication"; the article advocating fasting during the month of

18  August in honor of Jackson and two others; and the photograph of Jackson in an issue of *Prison

19  Focus* newspaper.  In a second sworn declaration in support of summary judgment, Russell states

20  that "[w]hen I search an inmate's cell for any reason, I look for evidence of the inmate's

21  involvement with a prison gang or disruptive group, as well as for any other contraband that is a

22  danger to the security of the prison."  On August 14, 2007, in addition to the Swahili phrases

23  noted above, Russell found the four confiscated items, which "indicated that Hawkins might be

24  associated with the BGF."  (Dkt. No. 53 at 11-12.)  Defendants argue that "[w]hen Hawkins was

25  found in possession of documents, other than 'Blood in My Eye,' indicating that he was an

26  associate of the BGF, his book was properly seized as evidence of gang involvement."  (Mtn. at

1   14.)

2          In his opposition to summary judgment, plaintiff "does not dispute the fact that it

3   is in the legitimate penological interest of CDCR to confiscate any material that is evidence of

4   gang involvement." (Dkt. No. 48 ("Opp.") at 4.)  Nor does he dispute that "BGF is a prison gang

5   that presents a serious risk to California Prisons."  (Id.; see DUF at 8-11.)

6          However, he argues that "he is not, nor has he ever been an associate or member

7   of the BGF prison gang"; rather, he was simply an "avid reader [with] an interest in Black

8   History." (Id. at 2, 4.)  Indeed, he asserts (and defendants do not dispute) that in August 2007 he

9   was a "model prisoner" who had "remained disciplinary free since being incarcerated" almost

10  nine years ago.  (Id. at 8, 10; see Dkt. No. 48 at 15 ( Hawkins Decl. ¶ 5).)  Plaintiff further asserts

11  that none of the four items confiscated from his cell in August 2007 are "on CDCR's statewide

12  list of banned materials."[5]  (Id. at 5.)  "In fact all the other items confiscated from plaintiff at that

13  time, were items he legitimately received from the prison mailroom."  (Id. at 6.)

14              It should be obvious to this court, that there is some question as to
                what constitutes gang material.  Defendants assert that if an inmate
15              possesses a number of items the defendants deem to be gang
                material, that inmate is automatically associated with or an actual
16              member of the BGF prison gang.

17              This is done d[e]spite the fact, that plaintiff or other black inmates
                have never been notified by the defendants or anyone else at Old
18              Folsom Prison, as to what written materials or combination of
                written materials constitutes gang activity.
19

20  (Id. at 6.)  Plaintiff further argues that defendants have failed to show that the four items found in

21  his cell in August 2007 constitute evidence that plaintiff was involved in gang activity "in that he

22  knowingly promotes or assists any gang."  (Opp. at 8.)

23  \\\\\\

24

25          [5] Defendants define this is a "list of books and other written materials that are disallowed
        by all state prisons, and which are confiscated by prison mailroom staff if they are sent through
26      the mail."  (Dkt. No. 53 at 2, fn. 2.)

1    In reply, defendants argue that whether plaintiff "is or is not a BGF associate is

2  not determinative of the First Amendment claim in this case.  The question is, whether there was

3  some evidence to believe that Hawkins was involved in gang activity."  (Dkt. No. 53 at 2.)  Here,

4  "there was a legitimate penological interest in taking Hawkins' photocopy of George Jackson's

5  book because there was evidence that he might be associated with the BGF."  (Id. at 4.)

6  II. Summary Judgment Standards Under Rule 56

7    Summary judgment is appropriate when it is demonstrated that there exists "no

8  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

9  matter of law."  Fed. R. Civ. P. 56(c).

10    Under summary judgment practice, the moving party
         always bears the initial responsibility of informing the district court
11       of the basis for its motion, and identifying those portions of "the
         pleadings, depositions, answers to interrogatories, and admissions
12       on file, together with the affidavits, if any," which it believes
         demonstrate the absence of a genuine issue of material fact.

13

14  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

15  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

16  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

17  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

18  after adequate time for discovery and upon motion, against a party who fails to make a showing

19  sufficient to establish the existence of an element essential to that party's case, and on which that

20  party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

21  concerning an essential element of the nonmoving party's case necessarily renders all other facts

22  immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

23  whatever is before the district court demonstrates that the standard for entry of summary

24  judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

25    If the moving party meets its initial responsibility, the burden then shifts to the

26  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

1  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

2  establish the existence of this factual dispute, the opposing party may not rely upon the

3  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

4  form of affidavits, and/or admissible discovery material, in support of its contention that the

5  dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

6  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

7  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

8  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

9  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

10  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

11  1436 (9th Cir. 1987).

12         In the endeavor to establish the existence of a factual dispute, the opposing party

13  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

14  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

15  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

16  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

17  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

18  committee's note on 1963 amendments).

19         In resolving the summary judgment motion, the court examines the pleadings,

20  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

21  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

22  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

23  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

24  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

25  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

26  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

'genuine issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

        A. <u>First Amendment</u>

        In moving for summary judgment, defendants argue that plaintiff has failed to

show a genuine factual dispute exists as to whether defendant violated plaintiff's First

Amendment rights by confiscating his copy of *Blood in My Eye*.

        In prison, an inmate "retains those First Amendment rights that are not

inconsistent with his status as a prisoner or with the legitimate penological objectives of the

corrections system.  Thus, challenges to prison restrictions that are asserted to inhibit First

Amendment interests must be analyzed in terms of the legitimate policies and goals of the

corrections system, to whose custody and care the prisoner has been committed in accordance

with due process of law."  <u>Pell v. Procunier</u>, 417 U.S. 817, 822 (1974).

        In evaluating whether prison regulations are reasonably related to legitimate

penological interests, the court applies the factors set forth in <u>Turner v. Safely</u>, 482 U.S. 78, 79

(1987).  The task in considering the <u>Turner</u> factors is to determine whether the state shows a

reasonable relation between the policy and legitimate penological objectives.  <u>Beard v. Banks</u>,

548 U.S. 521, 527 (2006).  While all justifiable inferences must be drawn in the prisoner's favor

with respect to matters of disputed fact, in disputed matters of professional judgment the court's

inferences must accord deference to the views of prison authorities.  <u>See</u> <u>id</u>. at 526.  Unless a

prisoner can point to evidence showing the policy is not reasonably related to legitimate

penological objectives, sufficient to allow him to prevail on the merits, he cannot prevail at the

summary judgment stage.  <u>Id</u>.

        Prison security is a legitimate and neutral penological interest.  Stefanow v.

<u>McFadden</u>, 103 F.3d 1466, 1472 (9th Cir. 1996) (recognizing prison security as a legitimate and

1   "compelling" penological interest and upholding content-based confiscation of book advocating

2   racism and violence); see also Farmer v. Brennan, 511 U.S. 825, 833 (1994).  Prison gangs in

3   particular are a threat to inmate and staff safety, as well as to prison order.  See, e.g., Wilkinson

4   v. Austin, 545 U.S. 209, 227 (2005).

5           Based on Russell's August 2007 report and the administrative grievance record,

6   defendants confiscated *Blood in My Eye* pursuant to 15 CCR §§ 3378 and 3006(d), among other

7   regulations.  Both clearly qualify as regulations enacted for the legitimate goal of protecting

8   prison inmates and staff, and are facially neutral.  (See Dkt. No. 37 at 9.)  In determining whether

9   defendants' application of these regulations to plaintiff violated his First Amendment rights, "we

10  must determine whether there is a genuine dispute as to whether [plaintiff's possession of *Blood

11  in My Eye*] in fact implicated legitimate security concerns." (Id., citing Hagis v. Foster, 312 F.3d

12  404, 410 (9th Cir. 2002).)

13          Defendants have the burden of proving that the confiscation furthered legitimate

14  security interests.  Here, it is undisputed that George Jackson was a founding member of the

15  BGF, "a criminal organization that has branches in many, if not most, prisons in the United

16  States.  The BGF is involved in criminal activities both inside and out of prisons, including

17  homicides, drug trafficking, and burglary." DUF at 9-11; Plaintiff's Response to DUF 9-11 (Dkt.

18  No. 48-1).  It is undisputed that BGF "is a prison gang that presents a serious risk to California

19  prisons."[6]  Opp. at 4.  And it is undisputed that "it is in the legitimate penological interest of

20  CDCR to confiscate any material that is evidence of gang involvement." (Id.)

21  _____

22          [6] See also Harrison v. Milligan, No. C09-4665 SI (pr), 2011 WL 4404144 at *1 (N.D.
    Cal. Sept. 21, 2011) (stating undisputed facts on summary judgment in First Amendment case):

23              The BGF is a recognized prison gang.  The BGF has incorporated
                George Jackson's ideologies into their beliefs.  The BGF has
24              adopted the Black Panthers, George Jackson and other
                revolutionary figures for their own use.  In order to promote BGF
25              ideologies, BGF members circulate pamphlets which discuss the
                Black Panthers and encourage revolution by people of African
26              descent to liberate themselves from an oppressive government.

The court finds that defendants have met their initial burden of showing that they confiscated *Blood in My Eye* in furtherance of institutional security.  Multiple items in plaintiff's possession in August 2007 suggested an interest in Jackson and the BGF.  The undisputed facts about Jackson and the BGF "demonstrate a non-conclusory connection between the materials confiscated and . . . legitimate concerns."  Avery v. Thompson, No. C 03-4233 RMW (PR), 2011 WL 2532364 at *4 (N.D. Cal. June 24, 2011); see Harper v. Wallingford, 877 F.2d 728, 732–33 (9th Cir. 1989) (affirming summary judgment for defendants based on prison superintendent's affidavit stating that the challenged materials could lead to violence, and explaining why the possession of such materials could lead to a security threat).

In Gray v. Woodford, Civ. No. 05-CV-1475 MMA (CAB), 2010 WL 2231805 at **8-9 (S.D. Cal. Feb. 10, 2010) (findings and recommendations adopted by district court on June 2, 2010), the court found that there "certainly was some evidence in the record to support the conclusion that Plaintiff was actively involved with BGF," and that the evidence was "more than sufficient to support the decision to change Plaintiff's gang affiliation status to active."  This evidence included plaintiff's possession of "literature by George Jackson . . . , consistent with BGF training and recruitment" and "Plaintiff's display of a photograph of George Jackson[.]"  Id.  "Any one of these pieces of evidence would have qualified to support Plaintiff's validation because each has 'sufficient indicia of reliability.'"  Id. at 8, citing  Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003).  Similarly here, whether or not plaintiff was actually involved in furthering BGF activities, it was reasonable of defendants to confiscate materials "consistent with BGF training and recruitment" such as Jackson's book, *Blood in My Eye*.

Consequently, the burden shifts to plaintiff to demonstrate a genuine dispute of material fact as to whether defendants acted in furtherance of institutional security.  Plaintiff contends that he possessed *Blood in My Eye* for years at other institutions – and for several months at Folsom – without incident until its confiscation in August 2007.  He contends that he was not involved in BGF activities, but possessed BGF-related materials because of an interest in

1   Black history.  He further asserts that, given his record as a model prisoner, defendants had no

2   reason to suspect him of gang involvement aside from various – in his case, harmless – reading

3   materials found in his cell in August 2007.

4            The court concludes that none of these assertions raise a genuine dispute of

5   material fact as to whether defendants reasonably confiscated *Blood in My Eye*.  Even if plaintiff

6   did nothing more than possess multiple items that, in total, suggested a keen interest in Jackson

7   and the BGF, this was enough to "implica[te] legitimate security concerns."  Accordingly, the

8   court will grant summary judgment as to plaintiff's First Amendment claim.[7]

9            B. Due Process

10           Plaintiff alleges that his federal right to due process was violated because he was

11  not given notice that *Blood in My Eye* would be "censored" or that inmates found in possession

12  of the book would receive one source point toward gang validation.[8]  (Complaint ¶ 75.)  As

13  noted above, it is now undisputed that the book was not the subject of a formal statewide or

14  institutional ban in August 2007.

15           In their pending motion for summary judgment, defendants argue that plaintiff had

16  no federal due process right to be notified that *Blood in My Eye* was subject to being confiscated,

17  and that the state law provisions he cites do not give rise to a federal constitutional claim.

18           In his opposition to summary judgment, plaintiff states:

19           Plaintiff's initial claim . . . was that he was not given proper notice
            per CDCR regulations, that the book 'Blood in My Eye' was
20           disallowed and contraband.

21

22           [7] This being so, the court does not reach defendants' argument for qualified immunity.

23           [8] Plaintiff claims that defendants violated Cal. Penal Code § 2080, which provides that a
24  "copy of the rules and regulations prescribing the duties and obligations of prisoners shall be
    furnished to each prisoner" under CDCR's jurisdiction; and 15 CCR § 3002(a)(2), which
25  provides that "[w]ithin 14 days of transfer to another departmental institution or facility, the new
    arrival shall be given a written summary of local procedures governing the conduct and activities
26  of inmates confined at that location and a summary of the range of work and training programs
    offered by and available at that institution or facility."

> Since now . . . defendants admit that the books authored by
> Jackson are in fact not disallowed or contraband, but are subject to
> being confiscated only if the inmate who possesses it is involved in
> a criminal conspiracy.
>
> As a result, <u>plaintiff's initial claim is moot</u>, and plaintiff simply
> denies that he was or has ever been involved in a criminal
> conspiracy involving the BGF.

(Dkt. No. 48 at 12; emphasis added.)

Defendants take this to mean that plaintiff has effectively abandoned his federal due process claim.  (Dkt. No. 53 at 2.)  However, viewing the complaint in the light most favorable to plaintiff, the court concludes that plaintiff's due process claim does not turn on whether *Blood in My Eye* was the subject of a statewide or institutional ban in August 2007.  Rather, plaintiff claims, more generally, that in August 2007, he had every reason to believe that his possession of *Blood In My Eye* was unproblematic:  He had received the book four years earlier via prison mail.  Prison authorities returned the book to him when he was transferred to Donovan State Prison, and again when he was transferred to Folsom in December 2006.  Drawing all reasonable inferences in plaintiff's favor, the court assumes that other officers at Folsom had searched plaintiff's cell prior to August 2007 and were aware that he possessed a copy of the book.  Russell's sudden confiscation of the book began "the process of validating plaintiff as a member or associate of the BGE."  (Complaint ¶ 61.)  Plaintiff claims that, had he known the "consequences" of keeping the book, he would have gotten rid of it.  (<u>Id</u>. ¶ 70.)

In opposing summary judgment, plaintiff asserts that "there is some question as to what constitutes gang material[]" at Folsom.  Indeed, while defendants originally claimed that *Blood in My Eye* was the subject of an institutional ban, they now contend that an inmate may possess the book without censure, so long as he does not also possess an unspecified number of additional BGF-related items.  Between defendants' changing explanations and plaintiff's four-year history of possessing the book without incident, plaintiff is credible when he claims that in August 2007 he had little reason to believe the book would be confiscated and used as a source

1  point toward gang validation.  The question is whether these circumstances violate plaintiff's

2  federal right to due process of law.

3          The state regulations governing prison gang validation and security housing are

4  well established. A prisoner's gang involvement is considered "information ... which is or may

5  be critical to the safety of persons inside or outside" of California prisons.  Cal. Code Regs. tit.

6  15, § 3378(a).  In response to this concern, institutional gang investigators are assigned to each

7  prison to investigate allegations of gang involvement.  Id., § 3378(c).  Allegations that a prisoner

8  is involved in gang activity are to be set forth on a "CDC Form 812–A or B," id., § 3378(c) (1),

9  wherein documented gang activity within the past six years is deemed "current activity," id.  An

10  inmate may be validated as a gang member or associate based upon three or more independent

11  sources of information "indicative of" "actual membership" or "association with validated gang

12  members or associates."  Id., §§ 3378(c)(3), (4).  Such information may include, inter alia,

13  statements from other inmates, debriefing reports, written materials and communications, and

14  observation by staff.  Id., § 3378(c) (8).  Statements from informants may be relied upon only if

15  their information is independently corroborated or the informant is otherwise known to be

16  reliable.  Id., §§ 3378(c)(8)(H); 3321(b)(1).

17          Pending completion of an investigation whether an inmate warrants gang

18  validation, the inmate may be placed in administrative segregation.  Id., § 3335 (authorizing

19  "immediate" segregation of an inmate whose "presence in the general inmate population presents

20  an immediate threat to the safety of the inmate or others, endangers institution security or

21  jeopardizes the integrity of an investigation of an alleged serious misconduct or criminal

22  activity").  Once the prison determines that an inmate is a member or associate of a prison gang,

23  the inmate is routinely transferred to a SHU.  Id., § 3341.5(c)(2)(A)(2) ("a validated prison gang

24  member or associate is deemed to be a severe threat to the safety of others or the security of the

25  institution and will be placed in a SHU for an indeterminate term").

26  \\\\\

These procedures comport with constitutional requirements.  The process constitutionally due an inmate placed in segregated housing depends on whether the placement is disciplinary or administrative.  Toussaint v. McCarthy, 801 F.2d 1080, 1099 (9th Cir. 1986).  In Bruce, supra, 351 F.3d at 1287, the Ninth Circuit determined that California's policy of placing suspected gang members in segregation is an administrative decision, undertaken to preserve order in the prison. When an inmate is placed in segregation for administrative purposes, due process requires only the following procedures:

> Prison officials must hold an informal nonadversary hearing within a reasonable time after the prisoner is segregated. The prison officials must inform the prisoner of the charges against the prisoner or their reasons for considering segregation. Prison officials must allow the prisoner to present his views.... [D]ue process [ ] does not require detailed written notice of charges, representation by counsel or counsel-substitute, an opportunity to present witnesses, or a written decision describing the reasons for placing the prisoner in administrative segregation.

Toussaint, 801 F.2d at 1100–01 (footnote omitted).

In Rios v. Tilton, No. 2:07-cv-0790 WBS KJN P, 2011 WL 3684515 at *13 (E.D. Cal. Aug. 23, 2011) (report and recommendations adopted by district court on Oct. 19, 2011), plaintiff brought due process claims against prison authorities and sought an injunction requiring:

> a clear and fair prison gang management policy that: (1) provides inmates adequate notice of what conduct is proscribed and what conduct is permitted; (2) defines key terms, i.e. gang activity, threat, inactive and active gang affiliates, associates, involvement in gang activity, association; (3) provides clarity for enforcement and does not reach a broad range [of] innocent conduct or provide unbridled discretion to defendants; (4) provide reasonable minimal standards to guide defendants when they [are] judging whether or not any inmate is a prison gang affiliate/associate or threat to the safety or the security of the institution and others.

The court granted summary judgment for defendants, finding that plaintiff had presented no evidence that the regulations promulgated by defendants were "'so deficient' as to intrinsically repudiate constitutional rights." Id.

In Treglia v. Director of CDCR, No. 2:09-cv-354 KJN P, 2010 WL 4905741 at *6

1  (E.D. Cal. Nov. 24, 2010) (report and recommendations adopted by district court on Feb. 7,

2  2011), plaintiff argued that defendants

> did not give him proper notice that they considered the Meso-
> American symbol to be gang-related.  Plaintiff contends that he did
> not know that this symbol signified association with the [Mexican
> Mafia.]  Plaintiff contends that he has had this symbol tattooed on
> the back of his neck since he was twelve years old. He argues that
> this symbol is used by Hispanic street gangs from southern
> California to identify themselves as southerners. Plaintiff argues
> that this symbol is a 'fad' that can be found on sweaters, clothing
> and other items. Plaintiff also argues that the regulation relied on
> by defendants to find that the symbol was evidence of gang
> affiliation was unconstitutionally vague.

9  The court denied plaintiff's motion for partial summary judgment, stating: "Due process did not

10  require that plaintiff be given notice that the symbol signified association with the [Mexican

11  Mafia]." Id.. See also Ruiz v. Fischer, No. C 07-326 MHP, 2010 WL 4807052 at *7 (N.D. Cal.

12  Nov. 18, 2010) ("[A] document need not show that the inmate engaged in or directed actual

13  criminal activity for that document to be used to validate an inmate as a gang member or

14  associate.  Although evidence of criminal activity may be used to validate an inmate, it is not the

15  only kind of evidence that may be used.  See 15 CCR § 3000 ('gang' defined), § 3378(c) (gang

16  involvement investigations and sources).")

17       As evidenced in the above cases, the Fourteenth Amendment does not require that

18  an inmate receive notice of each specific item (or combination of items) potentially

19  subject to confiscation and/or use in the gang validation process.  Accordingly, the court will

20  grant defendants' motion for summary judgment as to plaintiff's due process claim.

21       C.  Equal Protection

22       Plaintiff alleges that, on August 14, 2007, Russell was not assigned to plaintiff's

23  tier but nonetheless conducted a lengthy search of plaintiff's cell, resulting in confiscation of

24  Blood in My Eye.  (Complaint ¶ 39.)  He alleges that Russell "[h]as a history of searching the

25  cells of inmates not assigned to his tier. (Especially the cells of African-American Inmates)[.]"

26  (Id.)  Plaintiff claims that he

1
2
3

> has spoken to a number of black inmates at Folsom Prison, that
> defendant Russell had searched their cells and confiscated the
> book, 'Blood In My Eye,' and submitted the paperwork to have
> these black inmates validated as members or associates of the
> BGF.

4   (Id. ¶ 68.)  Plaintiff alleges that, in his assessment, none of these inmates "were members or

5   associates of the BGF, with no desire to be a member or associate."  (Id. ¶ 69.)  Plaintiff further

6   claims that defendants violated his right to equal protection by failing to notify him that *Blood in*

7   *My Eye* was subject to confiscation "and the consequences for any African-American inmate

8   found in possession of said book."  (Id. ¶ 75.)

9           Prisoners are protected from racial discrimination by the Equal Protection Clause.

10  Walker v. Gomez, 370 F.3d 969, 973 (2004).  "'To state a claim under 42 U.S.C. § 1983 for a

11  violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that

12  the defendants acted with an intent or purpose to discriminate against the plaintiff based upon

13  membership in a protected class.'"  Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir.

14  2001), quoting Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir.1 998).  "Intentional

15  discrimination means that a defendant acted at least in part because of a plaintiff's protected

16  status."  Serrano v. Francis, 345 F.3d 1071, 1082 (9th Cir. 2003), quoting Maynard v. City of San

17  Jose, 37 F.3d 1396, 1404 (9th Cir. 1994).  "To avoid summary judgment, [Plaintiff] 'must

18  produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the

19  evidence that [Defendant's] decision was racially motivated.' "  Serrano, 345 F.3d at 1082,

20  quoting Bingham v. City of Manhattan Beach, 329 F.3d 723, 732 (9th Cir.2003) (citations and

21  alterations omitted).

22          Here, plaintiff has submitted no evidence that Russell's or any other defendant's

23  actions were motived by racial bias, other than plaintiff's own beliefs.  See Ellis v. Cambra, No.

24  1:02-5646 AWI SMS PC, 2010 WL 4137158 (E.D. Cal. Oct. 19, 2010) (findings and

25  recommendations adopted by district court on July 28, 2011) (granting summary judgment for

26  defendant on equal protection claim where plaintiff failed to show that gang validation based on

plaintiff's possession of BGF-related materials was racially motivated).  In a declaration attached to defendants' reply, Russell asserts that he has "the authority, and responsibility" to search the cell of any inmate, regardless of tier.  He states that he has searched the cells of "inmates of all races" and found gang-related evidence in the cells of Hispanic and white inmates, respectively.  "When I search an inmate's cell for any reason, I look for evidence of the inmate's involvement of a prison gang or a disruptive group, as well as for any other contraband that is a danger to the security of the prison."  (Dkt. No. 53 at 11-12.)  Given this context, plaintiff's claims that Russell searched the cells of African-American inmates not on his tier, confiscated the book *Blood in My Eye* from them, and submitted paperwork concerning gang validation based on their possession of the book, is not evidence of racial bias.  Plaintiff's personal belief that these inmates were not "members or associates" of the BGF is neither here nor there, as prison officials may lawfully confiscate gang-related materials in furtherance of institutional security, as discussed above.  Similarly, defendants' failure to notify African-American inmates that *Blood in My Eye* was potentially subject to being confiscated and used to validate them as gang-involved, is neither a violation of inmates' constitutional rights nor suggestive of racial bias.

Because plaintiff has not raised a triable issue of fact as to whether defendants engaged in intentional racial discrimination by confiscating *Blood in My Eye*, the court will grant defendants' motion for summary judgment as to plaintiff's equal protection claim.

Accordingly, IT IS HEREBY ORDERED THAT:

1.  Defendants' July 1, 2011 motion for summary judgment (Dkt. No. 42) is granted; and

2. This case is closed.

Dated: March 23, 2012

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

2 - hawk2791.msj